RECEIPT #_____
AMOUNT $ 150
SUMMONS ISSUED Yes
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. Kimberland
DATE 2-13-04

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CATHERINE DUKES, Individually and On Behalf :    Civil Action No.
of All Others Similarly Situated,           :

                               :    **CLASS ACTION COMPLAINT**

                    Plaintiff,   :

                               :    JURY TRIAL DEMANDED

                  vs.       :

                               :    04 - 10315 PBS

COLUMBIA ACORN FUND, COLUMBIA : 
ACORN SELECT, COLUMBIA ACORN USA, :
COLUMBIA ASSET ALLOCATION FUND, :
COLUMBIA BALANCED FUND. COLUMBIA :
COMMON STOCK FUND, COLUMBIA :
DISCIPLINED VALUE FUND, COLUMBIA :
DIVIDEND INCOME FUND, COLUMBIA :
GROWTH & INCOME FUND, COLUMBIA :
GROWTH FUND, COLUMBIA GROWTH :
STOCK FUND, COLUMBIA LARGE CAP CORE :
FUND, COLUMBIA LARGE CAP GROWTH :
FUND, COLUMBIA LARGE COMPANY INDEX :
FUND, COLUMBIA LIBERTY FUND, :
COLUMBIA MID CAP GROWTH FUND, :
COLUMBIA MID CAP VALUE FUND, :
COLUMBIA REAL ESTATE EQUITY FUND, :
COLUMBIA SMALL CAP FUND, COLUMBIA :
SMALL CAP VALUE FUND, COLUMBIA :
SMALL COMPANY EQUITY FUND, :
COLUMBIA SMALL COMPANY INDEX FUND, :
COLUMBIA STRATEGIC INVESTOR FUND, :
COLUMBIA TAX-MANAGED AGGRESSIVE :
GROWTH FUND, COLUMBIA TAX- :
MANAGED GROWTH FUND, COLUMBIA :
TAX-MANAGED GROWTH FUND II, :
COLUMBIA TAX-MANAGED VALUE FUND, :
COLUMBIA TECHNOLOGY FUND, :
COLUMBIA THERMOSTAT FUND, :
COLUMBIA UTILITIES FUND, COLUMBIA :
YOUNG INVESTOR FUND. COLUMBIA :
ACORN INTERNATIONAL, COLUMBIA :
ACORN INTERNATIONAL SELECT, :
COLUMBIA EUROPE FUND, COLUMBIA :
GLOBAL EQUITY FUND, COLUMBIA :
INTERNATIONAL EQUITY FUND, COLUMBIA :
INTERNATIONAL STOCK FUND, :

**Caption Continues On Next Page**

COLUMBIA NEWPORT ASIA PACIFIC FUND,    :
COLUMBIA NEWPORT JAPAN    :
OPPORTUNITIES FUND, COLUMBIA    :
NEWPORT GREATER CHINA FUND,    :
COLUMBIA NEWPORT TIGER FUND,    :
COLUMBIA CONTRARIAN INCOME FUND,    :
COLUMBIA CORPORATE BOND FUND,    :
COLUMBIA FEDERAL SECURITIES FUND,    :
COLUMBIA FIXED INCOME SECURITIES    :
FUND, COLUMBIA FLOATING RATE    :
ADVANTAGE FUND, COLUMBIA FLOATING    :
RATE FUND, COLUMBIA HIGH YIELD FUND,    :
COLUMBIA HIGH YIELD OPPORTUNITY    :
FUND, COLUMBIA INCOME FUND,    :
COLUMBIA INTERMEDIATE BOND FUND,    :
COLUMBIA INTERMEDIATE GOVERNMENT    :
INCOME FUND, COLUMBIA MONEY    :
MARKET FUND, COLUMBIA QUALITY PLUS    :
BOND FUND, COLUMBIA SHORT TERM    :
BOND FUND, COLUMBIA STRATEGIC    :
INCOME FUND, COLUMBIA US TREASURY    :
INDEX FUND, COLUMBIA CALIFORNIA TAX-    :
EXEMPT FUND, COLUMBIA CONNECTICUT    :
INTERMEDIATE MUNICIPAL BOND,    :
COLUMBIA CONNECTICUT TAX-EXEMPT    :
FUND, COLUMBIA FLORIDA INTERMEDIATE    :
MUNICIPAL BOND FUND, COLUMBIA HIGH    :
YIELD MUNICIPAL FUND, COLUMBIA    :
INTERMEDIATE TAX-EXEMPT BOND FUND,    :
COLUMBIA MANAGED MUNICIPALS FUND,    :
COLUMBIA MASSACHUSETTS    :
INTERMEDIATE MUNICIPAL BOND FUND,    :
COLUMBIA MASSACHUSETTS TAX-EXEMPT    :
FUND, COLUMBIA MUNICIPAL MONEY    :
MARKET FUND, COLUMBIA NATIONAL    :
MUNICIPAL BOND FUND, COLUMBIA NEW    :
JERSEY INTERMEDIATE MUNICIPAL BOND    :
FUND, COLUMBIA NEW YORK    :
INTERMEDIATE MUNICIPAL BOND FUND,    :
COLUMBIA NEW YORK TAX-EXEMPT FUND,    :
COLUMBIA OREGON MUNICIPAL BOND    :
FUND, COLUMBIA PENNSYLVANIA    :
INTERMEDIATE MUNICIPAL BOND FUND,    :
COLUMBIA RHODE ISLAND INTERMEDIATE    :
MUNICIPAL BOND FUND, COLUMBIA TAX-    :
                                                                      :

**Caption Continues On Next Page**

EXEMPT FUND, COLUMBIA TAX-EXEMPT :
INSURED FUND, COLUMBIA SMALL CAP :
GROWTH FUND , COLUMBIA EUROPEAN :
THEMATIC EQUITY FUND, COLUMBIA :
GLOBAL THEMATIC EQUITY FUND, :
COLUMBIA DAILY INCOME COMPANY :
FUND (collectively known as "COLUMBIA :
FUNDS"); COLUMBIA ACORN TRUST, :
COLUMBIA BALANCED FUND INC./OR, :
COLUMBIA COMMON STOCK FUND INC., :
COLUMBIA DAILY INCOME COMPANY, :
COLUMBIA FIXED INCOME SECURITIES :
FUND INC., COLUMBIA FLOATING RATE :
ADVANTAGE FUND, COLUMBIA FLOATING :
RATE FUND, COLUMBIA FUNDS TRUST I, :
COLUMBIA FUNDS TRUST II, COLUMBIA :
FUNDS TRUST III, COLUMBIA FUNDS TRUST :
IV, COLUMBIA FUNDS TRUST IX, :
COLUMBIA FUNDS TRUST V, COLUMBIA :
FUNDS TRUST VI, COLUMBIA FUNDS TRUST :
VII, COLUMBIA FUNDS TRUST VIII, :
COLUMBIA FUNDS TRUST XI, COLUMBIA :
GROWTH FUND INC., COLUMBIA HIGH :
YEILD FUND INC., COLUMBIA :
INSTITUTIONAL FLOATING RATE INCOME :
FUND, COLUMBIA INTERNATIONAL STOCK :
FUND INC., COLUMBIA MID CAP GROWTH :
FUND INC., COLUMBIA OREGON :
MUNICIPAL BOND FUND INC., COLUMBIA :
NATIONAL MUNICIPAL BOND FUND INC., :
COLUMBIA REAL ESTATE EQUITY FUND :
INC., COLUMBIA SHORT TERM BOND FUND :
INC., COLUMBIA SMALL CAP GROWTH :
FUND INC., COLUMBIA STRATEGIC :
INVESTOR FUND INC., COLUMBIA :
TECHNOLOGY FUND INC. (collectively known :
as "COLUMBIA FUNDS REGISTRANTS"); :
FLEETBOSTON FINANCIAL CORPORATION; :
COLUMBIA MANAGEMENT GROUP, INC.; :
COLUMBIA MANAGEMENT ADVISORS, INC.; :
COLUMBIA WANGER ASSET :
MANAGEMENT, L.P.; COLUMBIA FUNDS :
DISTRIBUTOR, INC.; and JOHN DOES 1-100, :
                                        :
                    Defendants.         :
                                        :

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings as well as other regulatory filings and reports and advisories about the Columbia Funds (as defined in the above caption), press releases, and media reports about the Columbia Funds. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired shares or other ownership units of one or more of the mutual funds in the Columbia family of funds (i.e., the Columbia Funds as defined in the caption, above) between February 13, 1999 and January 14, 2004, inclusive, and who were damaged thereby. Plaintiff seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act") and the Investment Advisers Act of 1940 (the "Investment Advisers Act") (the "Class").

2.      This action charges defendants with engaging in an unlawful and deceitful course of conduct designed to improperly financially advantage defendants to the detriment of plaintiff and the other members of the Class. As part and parcel of defendants' unlawful conduct, the Fund Defendants, as defined below, in clear contravention of their fiduciary responsibilities, and disclosure obligations, failed to properly disclose that select favored customers were improperly allowed to "time" their mutual fund trades. Such timing, as more fully described herein, improperly allows an investor to trade in and out of a mutual fund to exploit short-term moves and inefficiencies in the manner in which the mutual funds price their shares.

3.      The truth emerged on January 15, 2004. On that date, before the market opened, FleetBoston Financial Corporation announced in a press release over *Business Wire* that its subsidiaries, Columbia Management Advisors, Inc. ("Columbia Management") and Columbia Funds Distributor, Inc. ("Columbia Distributor") received "Wells" notices from the regional office of the Securities and Exchange Commission ("SEC") in Boston, Massachusetts stating that the regional office intended on recommending an enforcement action against Columbia Management and Columbia Distributor for failing to disclose market timing activity in the Columbia family of mutual funds.

4.      In a letter to shareholders dated January 30, 2004, and later posted on Columbia Management's website, Columbia Management and Columbia Distributor acknowledged that the SEC and the New York Attorney General have been investigating the mutual fund trading activities in the Columbia Funds, defined below. Further, Columbia Management and Columbia Distributor stated that certain privileged investors were permitted to market time the Columbia Newport Tiger Fund, Columbia Growth Stock Fund, and the Columbia Young Investor Fund—which targeted children—from as early as 1998 to 2003. In addition, Columbia Management and Columbia Distributor stated that they had determined that the portfolio manager of the Columbia Small Company Equity Fund engaged in market timing through his 401(K) account in various Columbia Funds.

5.      On February 13, 2004, *The Wall Street Journal* reported that FleetBoston acknowledged that it had allowed improper market timing in the Columbia Young Investor Fund, Columbia Newport Tiger Fund, and Columbia Growth Stock Fund and that the Columbia Funds, accepted "sticky assets" from certain privileged investors in exchange for timing capacity in the Columbia Funds.

- 6 -

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C. § 77v); Section 80b-14 of the Investment Advisers Act (15 U.S.C. § 80b-14); and 28 U.S.C. §§ 1331, 1337.

7.     Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. Defendants FleetBoston, Columbia Management, and Columbia Distributor were active participants in the wrongful conduct alleged herein and are headquartered within this District.

8.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.     Plaintiff Catherine Dukes, as set forth in her certification, which is attached hereto and incorporated by reference herein, purchased shares or units of the Columbia Newport Greater China Fund during the Class Period and has been damaged thereby.

10.    Each of the Columbia Funds, including the Columbia Newport Greater China Fund, is a mutual fund that is regulated by the Investment Company Act of 1940, managed by defendant Columbia Management and/or Columbia Wanger, as defined below, and that buy, hold, and sell shares or other ownership units that are subject to the misconduct alleged in this complaint.

11.    Defendant FleetBoston Financial Corporation ("FleetBoston") is a financial services company and the ultimate parent of defendants bearing the Columbia name. FleetBoston maintains its corporate headquarters at 100 Federal Street, Boston, Massachusetts 02110.

12.    Defendant Columbia Management Group, Inc. ("Columbia Group"), wholly-owned subsidiary of FleetBoston, is the asset management arm of FleetBoston. Through its member firms, including Columbia Management and Columbia Wanger Asset Management, L.P. ("Columbia Wanger"), Columbia Group offers asset management services and financial products. Columbia Group is located at One Financial Center, Boston, MA 02111-2621.

13.    Defendant Columbia Management, a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Management is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Wanger, managed and advised the Columbia Funds during the Class Period. Columbia Management, along with Columbia Wanger, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds. Columbia Management is headquartered at 100 Federal Street, Boston, Massachusetts 02110.

14.    Defendant Columbia Wanger, a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Management is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Management, managed and advised the Columbia Funds during the Class Period. Columbia Wanger, along with Columbia Management, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds. Columbia Wanger is headquartered at 227 West Monroe, Suite 3000, Chicago, Illinois 60606.

- 8 -

15.    Columbia Management and Columbia Wanger are referred to collectively herein as the "Advisors."

16.    Columbia Distributor, a subsidiary of FleetBoston, was the distributor of the Columbia Funds during the Class Period. Columbia Distributor maintains is headquarters at One Financial Center, Boston, Massachusetts 02111.

17.    Defendants Columbia Funds Registrants are the registrants and issuers of the shares of one or more of the Columbia Funds.

18.    FleetBoston, Columbia Group, Columbia Management, Columbia Wanger, Columbia Distributor, Columbia Funds Registrants and the Columbia Funds are referred to collectively herein as the "Fund Defendants."

19.    The true names and capacities of defendants sued herein as John Does 1 through 100 are other active participants with the Fund Defendants in the widespread unlawful conduct alleged herein whose identities have yet to be ascertained. Such defendants were secretly permitted to engage in improper timing at the expense of ordinary Columbia Funds investors, such as plaintiff and the other members of the Class, in exchange for which these John Doe defendants provided remuneration to the Fund Defendants. Plaintiff will seek to amend this complaint to state the true names and capacities of said defendants when they have been ascertained.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased or otherwise acquired shares or like interests in any of the Columbia Funds, between February 13, 1999 and January 14, 2004, inclusive, and who were damaged thereby. Plaintiff and each of the Class members purchased shares or other ownership units in Columbia Funds

pursuant to a registration statement and prospectus. The registration statements and prospectuses pursuant to which plaintiff and the other Class members purchased their shares or other ownership units in the Columbia Funds are referred to collectively herein as the "Prospectuses." Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Columbia Funds and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

23.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

- 10 -

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of the Columbia Funds; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Introduction: The Double Standard for Privileged Investors

26.    Mutual funds, including the Columbia Funds, are meant to be long-term investments and are therefore the favored savings vehicles for many Americans' retirement and college funds. However, unbeknownst to investors, from at least as early as February 13, 1999 to January 14, 2004, inclusive, defendants engaged in fraudulent and wrongful schemes that enabled certain favored investors to reap many millions of dollars in profit, at the expense of plaintiff and other members of the Class, through secret timed trading. In exchange for allowing and facilitating this improper conduct, the Fund Defendants received substantial fees and other remuneration for themselves and their affiliates to the detriment of plaintiff and other members of the Class who knew nothing of these illicit arrangements. Specifically, the Advisors, as managers of the Columbia Funds, and each of the relevant fund managers, profited from fees the Advisors charged to the Columbia Funds that were measured as a percentage of the fees under

- 11 -

management. In exchange for the right to engage in timing, which hurt plaintiff and other Class members, materially and negatively affecting the value of the Columbia Funds, the John Doe Defendants agreed to park substantial assets in the Funds, thereby increasing the assets under Columbia Funds' management and the fees paid to Columbia Funds' managers. The assets parked in the Columbia Funds in exchange for the right to engage in timing have been referred to as "sticky assets." The synergy between the Fund Defendants and the John Doe Defendants hinged on ordinary investors' misplaced trust in the integrity of mutual fund companies and allowed defendants to profit handsomely at the expense of plaintiff and other members of the Class.

**Secret Timed Trading at the Expense of Plaintiff and Other Members of the Class**

27.     "Timing" is an arbitrage strategy involving short-term trading that can be used to profit from mutual funds use of "stale" prices to calculate the value of securities held in the funds' portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the net asset value ("NAV") is calculated. A typical example is a U.S. mutual fund that holds Japanese securities. Because of the time zone difference, the Japanese market may close at 2 *a.m.* New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese securities in his or her fund to arrive at an NAV at 4 *p.m.* in New York, he or she is relying on market information that is fourteen hours old. If there has been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low. Put another way, the NAV would not reflect the true current market value of the stocks the fund holds. This and similar strategies are known as "time zone arbitrage."

28.     A similar type of timing is possible in mutual funds that contain illiquid securities such as high-yield bonds or small capitalization stocks. Here, the fact that some of the Columbia

- 12 -

Funds' underlying securities may not have traded for hours before the New York closing time can render the fund's NAV stale and thus open it to being timed. This is sometimes known as "liquidity arbitrage."

29.    Effective timing captures an arbitrage profit that comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days, the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

30.    Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Trades necessitated by timer redemptions can also result in the realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market.

31.    It is widely acknowledged that timing inures to the detriment of long-term mutual fund shareholders and, because of this detrimental effect, the Prospectuses stated that timing is monitored and that the Fund Defendants work to prevent it. These statements were materially false and misleading because the Fund Defendants allowed the John Doe Defendants to time their trades and profit at the expense of ordinary fund investors.

### Defendants' Fraudulent Scheme

32.    On September 4, 2003 *The Wall Street Journal* reported that the New York Attorney General Elliot Spitzer had filed a complaint in New York Supreme Court alleging that certain mutual fund companies secretly allowed, and in some instances facilitated, a New Jersey-based hedge fund to engage in prohibited and/or fraudulent trading in mutual fund shares (the

"Spitzer Complaint"). In return for this favored treatment, which damaged long-term mutual

fund investors, the hedge fund parked funds in financial instruments controlled by the fund

companies or their affiliates to increase fund management fees, and entered into other

arrangements which benefited the fund companies and/or their affiliates. The article reported as

follows regarding the matter:

> Edward Stern . . . finds himself at the center of a sweeping investigation into the
> mutual-fund industry after paying $40 million to settle charges of illegal trading
> made by the New York State Attorney General's Office. According to the
> settlement, Mr. Stern's hedge fund, called Canary Capital Partners LLC, allegedly
> obtained special trading opportunities with leading mutual-fund families--
> including Bank of America Corp's Nations Funds, Bank One Corp., Janus Capital
> Group Inc. and Strong Financial Corp.-- by promising to make substantial
> investments in various funds managed by these institutions. [Emphasis in
> original].

The article indicated that the fraudulent practices enumerated in the Spitzer Complaint were just

the tip of the iceberg, stating as follows:

> *In a statement, Mr. Spitzer said "the full extent of this complicated fraud is not yet*
> *known," but he asserted that "the mutual-fund industry operates on a double*
> *standard" in which certain traders "have been given the opportunity to manipulate the*
> *system. They make illegal after-hours trades and improperly exploit market swings in*
> *ways that harm ordinary long-term investors."*

(Emphasis added).

     33.     The Spitzer Complaint received substantial press coverage and sparked additional

investigations by state agencies, the SEC and the U.S. Attorney for the Southern District of New

York, and led to calls for more regulation and tougher enforcement of the mutual and hedge fund

industries. On September 5, 2003, *The Wall Street Journal* reported that the New York Attorney

General's Office had subpoenaed "a large number of hedge funds" and mutual funds as part of

its investigation, "underscoring concern among investors that the improper trading of mutual-

fund shares could be widespread" and that the SEC, joining the investigation, planned to send

letters to mutual funds holding about 75% of assets under management in the U.S. to inquire

about their practices with respect to market-timing and fund-trading practices.

      34.    On January 15, 2004, before the market opened, FleetBoston issued a press

release reporting its fourth quarter 2003 results and further, revealing that Columbia

Management and Columbia Funds Distributor had received "Wells" notices from the SEC

relating to improper market timing in Columbia Funds and that the SEC intended to commence

an enforcement action against Columbia Management and Columbia Funds Distributor. In the

release, FleetBoston stated, in relevant part, as follows:

> In a separate development, FleetBoston said that earlier this month two of its
> subsidiaries, ***Columbia Management Advisors, Inc., and Columbia Funds***
> ***Distributor, Inc., received "Wells" notices stating that the SEC Regional Office***
> ***staff in Boston had made a preliminary determination to recommend that***
> ***enforcement action be brought against them***, alleging that certain fund
> prospectuses did not accurately disclose, in violation of fiduciary duties, certain
> trading activity in fund shares. ***We believe that the allegations relate to a limited***
> ***number of trading arrangements occurring in the period 1998-2003***. The
> majority of trades made pursuant to these arrangements were made by three
> entities and occurred in one international and two domestic funds. None of these
> arrangements is in existence today. The subsidiaries intend to engage in
> discussions with the SEC in an effort to reach a satisfactory resolution of these
> matters. [Emphasis added.]

      35.    On January 16, 2004, the Fund Defendants filed with the SEC a prospectus

supplement for various Columbia Funds which provided further detail on various investigations

of the Fund Defendants commenced by the SEC and the New York Attorney General. The

prospectus supplement stated, in relevant part, as follows:

> Legal Proceedings. ***Columbia Management Advisors, Inc. ("CMA"), the Funds'***
> ***adviser, and Columbia Funds Distributor, Inc. ("CFDI") the distributor of the***
> ***Funds' shares, and certain of their affiliates (collectively, "Columbia") have***
> ***received information requests and subpoenas from various regulatory***
> ***authorities, including the Securities and Exchange Commission ("SEC") and***
> ***the New York Attorney General, in connection with their investigations of late***
> ***trading and market timing in mutual funds***. Columbia has not uncovered any

instances where CMA or CFDI were knowingly involved in late trading of mutual fund shares.

*Columbia has identified a limited number of investors who had informal arrangements for trading Fund shares between 1998 and 2003. A majority of the transactions in connection with these arrangements occurred in one international fund and two domestic funds. The majority of the trading under these arrangements was made by three entities.* A substantial majority of the trading had ended by October 2002. None of these arrangements exists today. Information relating to those trading arrangements has been supplied to various regulatory authorities. To the extent that any Fund whose shares were involved in those trading activities was harmed by them, Columbia has undertaken to reimburse the Fund.

The SEC staff has issued notices to the effect that it has made a preliminary determination to recommend that the SEC bring civil enforcement actions, including injunctive proceedings, against CMA and CFDI, alleging that they have violated certain provisions of the federal securities laws. Columbia believes that those allegations are based principally on the trading arrangements referred to above. CMA and CFDI are engaged in discussions with the SEC staff in an effort to reach a satisfactory resolution of these matters. However, there can be no assurance that such a resolution will be reached. Any potential resolution of these matters may include, but not be limited to, sanctions, financial penalties, damages or injunctions regarding CMA or CFDI, and structural changes in the conduct of their business.

Although Columbia does not believe that these regulatory developments or their resolution will have a material adverse effect on the Funds, or on the ability of CMA and CFDI to provide services to the Funds, there can be no assurance that these matters or any adverse publicity or other developments resulting from them will not result in increased redemptions or reduced sales of Fund shares, which could increase transactions costs or operating expenses, or other consequences for the Funds. [Emphasis added.]

36.    In a letter to shareholders dated January 30, 2004, Joseph Palombo, Chief Operating Officer of Columbia Management and James Tambone, Co-President of Columbia Distributor acknowledged that the Fund Defendants were the subject of the investigation into mutual fund trading activities by the SEC and the New York State Attorney General.  Palombo and Tambone stated, in relevant part, as follows:

**Columbia Management is:**

- 16 -

Cooperating with Inquiries and Investigations As you may have read, during recent weeks and months, the Securities and Exchange Commission ("SEC"), the New York Attorney General and other authorities have been investigating mutual fund trading activities of firms across the US. Columbia Management is one of the firms included in these investigations. *Specifically, Columbia Management Advisors, Inc. ("CMA"), the advisor to the Columbia Family of Funds, and Columbia Funds Distributor, Inc. ("CFDI"), the distributor of the Columbia Family of Funds, and certain of their affiliates (collectively, "Columbia") have received and responded to information requests and subpoenas from various authorities.* Columbia Management has and will continue to cooperate fully with all requests for information and subpoenas.

**Reviewing Historical Trading Activity**
• Columbia Management does not knowingly permit late trading. Furthermore, we have not uncovered any instances where Columbia employees were knowingly involved in late trading of mutual fund shares.

• *Columbia Management has identified a limited number of investors who had informal arrangements for trading fund shares between 1998 and 2003. A majority of the transactions in connection with these arrangements occurred in one international fund, the Columbia Newport Tiger Fund, and two domestic funds, the Columbia Growth Stock Fund and the Columbia Young Investor Fund. The majority of the trading under these arrangements was made by three entities.*
A substantial majority of the trading had ended by October 2002 and none of these arrangements exists today. If it is determined that the affected funds were harmed by these trading arrangements, CMA will reimburse them.

• Columbia Management holds all asset management professionals to a high ethical standard and monitors their trading activity on an ongoing basis. *Columbia Management has determined that one portfolio manager, who managed the Columbia Small Company Equity Fund, an approximately $400 million fund, made frequent trades through his 401(k) account in both the fund that he managed and other funds.* Although the underlying trades made by this portfolio manager were relatively small, his trading was not consistent with the ethical standards of Columbia Management. Columbia Management terminated the portfolio manager's employment upon discovery of his trading activity. Information about the portfolio manager's trading activity has been provided to the SEC and the New York Attorney General. If it is determined that the affected funds were harmed by the portfolio manager's trading activity, CMA will reimburse them. [Emphasis added.]

37.    On February 13, 2004, *The Wall Street Journal* reported that the FleetBoston confirmed that the Fund Defendants permitted and facilitated improper market timing in at least three Columbia Funds, the Columbia Young Investor Fund, Columbia Newport Tiger Fund, and

the Columbia Growth Stock Fund, in violation of the explicit policies against such trading activity contained in the Funds' prospectuses. The article reported, in relevant part, as follows:

*Mutual-Fund employees at a unit of FleetBoston Financial Corp. improperly allowed "market-timers" to conduct rapid fire trades in three funds—including one targeted at children*—according to the company and people familiar with the trading.

*Rapid trading in the $855 million Young Investor Fund could prove especially embarrassing for Fleet because the revelation means employees in its sales arm allowed the fast-moving investors to skim profits from kids.* The fund, founded by Fleet's Stein Roe unit and now called the Columbia Young Investors Fund, focuses on stocks that "meet the needs of young consumers" and has its own child-centered Web site, younginvestor.com, to teach kids the value of starting to invest at a young age.

*Yesterday, Boston-based Fleet also acknowledged that its Columbia Funds unit and predecessor Liberty allowed trading in the $371 million Newport Tiger Fund and the $855 million Stein Roe Growth Stock Fund. Fleet also said that it would reimburse investors for losses caused by market-timing activity.*

\* \* \*

Asian stock funds, such as Newport Tiger, and other international funds are generally considered to be especially vulnerable to harm from market timers, who take advantage of time-zone differences and buy and sell fund shares at outdated prices. But the current scandal-related investigations into share trading have found few instances where fund officials allowed their foreign-stock funds to b used for market-timing because f the outsized opportunity to skim profits. As a result, the discovery of market-timing in the Newport Tiger fund is one the few instances where improper trading has been found in such a portfolio of overseas stocks.

*At the same time, Columbia Funds accepted so-called sticky assets, according to people familiar with the matter. In sticky-asset deals, market-timers put money in other investment vehicles run by the firm in order to help gain access to certain mutual funds for market-timing.*

\* \* \*

Currently, many Columbia Funds tell investors in prospectuses that "the fund is not intended for short-term or frequent trading in its shares." However, during much of the period when the timing arrangements are said to have been in place, Columbia had much stricter language. For example, the November 2002 prospectus language on many Columbia funds said that "the fund does not permit short-term or excessive trading in its shares." Mr. Salmans, the Fleet spokesman,

said the change was made in conjunction with the redemption fees and other measures that were believed to be a stronger deterrent to timers than prospectus language.

Meanwhile, according to an administrative complaint filed by the Massachusetts Securities Division, *brokers at the former Prudential Securities' Boston office testified that a mutual-fund sales representative—identified by people familiar with the matter as working for Liberty, which was later renamed Columbia— helped them circumvent Liberty's anti-market-timing rules.* The brokers testified that the sales rep "knew we were actively trading their funds and was promoting it," according to the complaint. [Emphasis added.]

## The Prospectuses Were Materially False and Misleading

38.    Prior to investing in any of the Columbia Funds, including the Columbia Newport Greater China Fund, plaintiff and each member of the class were entitled to and did receive one of the Prospectuses, each of which contained substantially the same materially false and misleading statements regarding the Columbia Funds' policies on timed trading.

39.    The Prospectuses falsely stated that the Columbia Funds actively safeguard shareholders from the recognized harmful effects of timing. For example, in language that typically appeared in the Prospectuses, the August 30, 2002 Columbia International Stock Fund Prospectus acknowledged that "short-term trading" is harmful to shareholders and represented that the Columbia Funds deters the practice, stating as follows:

> *The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses.* In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The fund into which you would like to exchange also may reject your request. [Emphasis added.]

40.    The Prospectuses failed to disclose and misrepresented the following material and adverse facts:

    (a)    that defendants had entered into an agreement allowing the John Doe Defendants to time their trading of the Columbia Funds shares;

    (b)    that, pursuant to that agreement, the John Doe Defendants regularly timed their trading in the Columbia Funds shares;

    (c)    that, contrary to the express representations in the Prospectuses, the Columbia Funds enforced their policy against frequent traders selectively, *i.e.*, they did not enforce it against the John Doe Defendants;

    (d)    that the Fund Defendants regularly allowed the John Doe Defendants to engage in trades that were disruptive to the efficient management of the Columbia Funds and/or increased the Columbia Funds' costs and thereby reduced the Columbia Funds' actual performance; and

    (e)    the Prospectuses failed to disclose that, pursuant to the unlawful agreements, the Fund Defendants benefited financially at the expense of the Columbia Funds investors.

**Defendants' Scheme and Fraudulent Course of Business**

41.    Each defendant is liable for (i) making false statements, or for failing to disclose adverse facts while selling shares of the Columbia Funds, and/or (ii) participating in a scheme to defraud and/or a course of business that operated as a fraud or deceit on purchasers of the Columbia Funds shares during the Class Period (the "Wrongful Conduct"). This Wrongful Conduct enabled defendants to profit at the expense of plaintiff and other Class members.

**Additional Scienter Allegations**

42.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Columbia Funds were materially false and misleading; knew that such statements or documents would be issued

- 20 -

or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Columbia Funds, their control over, and/or receipt and/or modification of Columbia Funds' allegedly materially misleading misstatements and/or their associations with the Columbia Funds which made them privy to confidential proprietary information concerning the Columbia Funds, participated in the fraudulent scheme alleged herein.

43.    Additionally, the Fund Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein. In exchange for allowing the unlawful practices alleged herein, the Fund Defendants, among other things, received increased management fees as a result of the scheme alleged herein. Moreover, mutual fund managers can easily spot market timing in their mutual funds simply by observing the trading activity within accounts; if the account, or persons controlling more than one account, engage in frequent trades the manager will know that they are engaging in market timing. The Spitzer Complaint emphasizes the ease with which the practice can be spotted by fund managers or their employees, as follows:

> Mutual fund managers are aware of the damaging effect that timers have on their funds. And while the effects on individual shareholders may be small once they are spread out over all the investors in a fund, their aggregate impact is not: for example, one recent study estimates that U.S. mutual funds lose $4 billion each year to timers. Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35, at http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf. While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds -- like those made by Canary -- are easy for managers to spot. And mutual fund managers have tools to fight back against timers. [Emphasis in original].